# State of New York Court of Appeals

OPINION

This opinion is uncorrected and subject to revision before publication in the New York Reports.

No. 29
In the Matter of National Fuel
Gas Supply Corporation,
        Appellant,
    v.
Joseph A. Schueckler et al.,
        Respondents,
et al.,
        Respondents.

Eamon P. Joyce, for appellant.
Gary A. Abraham, for respondents.
Niskanen Center, amicus curiae.

STEIN, J.:

In 2017, the Federal Energy Regulatory Commission issued a certificate of public

convenience and necessity to petitioner National Fuel Gas Supply for its proposed

construction of a 99-mile natural gas pipeline spanning from Pennsylvania to Western New York. We hold that this certificate of public convenience and necessity—which did not condition National Fuel's eminent domain power on receipt of a water quality certification and which remained valid and operative at all relevant times despite the New York State Department of Environmental Conservation's intervening denial of National Fuel's application for such a certification—exempted National Fuel from the public notice and hearing provisions of article 2 of the Eminent Domain Procedure Law (EDPL) in accordance with EDPL 206 (A). We, therefore, reverse the order of the Appellate Division.

I.

The question before us distills to whether the certificate of public convenience and necessity issued by the Federal Energy Regulatory Commission (FERC) to National Fuel satisfies EDPL 206 (A) so as to entitle National Fuel to exercise eminent domain over the land in dispute without undertaking additional review of the pipeline's public benefit. If satisfied, EDPL 206 (A) excuses compliance with various provisions of EDPL article 2 where a proposed condemnor has successfully completed a review of the project's public benefit and use before a state, federal, or local agency. Thus, we begin our analysis with a review of FERC's authority to issue such certificates under the federal Natural Gas Act, as well as the requirements of the EDPL.

A. The Natural Gas Act

The Natural Gas Act (NGA) regulates the interstate sale and transport of natural gas (see 15 USC § 717 [b]) and "confers upon FERC exclusive jurisdiction over the transportation and sale of natural gas in interstate commerce for resale" (Schneidewind v

ANR Pipeline Co., 485 US 293, 300-301 [1988]).  Prior to "the construction or extension of any facilities" for the transportation or sale of natural gas, a company must have "in force . . . a certificate of public convenience and necessity issued by [FERC] authorizing such acts or operations" (15 USC § 717f [c] [1] [a]; see Schneidewind, 485 US at 302-303).  FERC awards such a certificate when it determines that the applicant "is able and willing properly to do the acts and to perform the service proposed and to conform to . . . [federal] regulations" and when "the proposed . . . construction . . . is or will be required by the present or future public convenience and necessity" (15 USC § 717f [e]).  In deciding whether to issue a certificate of public convenience and necessity, FERC considers "all factors bearing on the public interest" (Atlantic Refining Co. v Public Serv. Comm'n of N.Y., 360 US 378, 391 [1959]), including the applicant's financial resources; public demand; the expected impact on property values, community development, tax revenue, and employment; the environmental impacts of the project;[1] and any potential adverse effects (see Certification of New Interstate Natural Gas Pipeline Facilities, 88 FERC ¶ 61227 [Sept 15, 1999], clarified 90 FERC ¶ 61128 [Feb 9, 2000], further clarified 92 FERC ¶ 61094 [July 28, 2000]; Minisink Residents for Envtl. Preserv. and Safety v F.E.R.C., 762 F3d 97, 102 [DC Cir 2014]).  FERC "will approve an application for a certificate only if the public benefits from the project outweigh any adverse effects" (88 FERC ¶ 61227, 61750).

---

[1] In connection with applications for certificates of public convenience and necessity under the NGA, FERC acts as the lead agency "for the purposes of coordinating all applicable Federal authorizations and for the purposes of complying with the National Environmental Policy Act" (15 USC § 717n [b] [1]).

FERC may "attach to the issuance of the certificate and to the exercise of the rights granted thereunder such reasonable terms and conditions as the public convenience and necessity may require" (15 USC § 717f [e]). Furthermore, FERC "must ensure that the proposed pipeline complies with all applicable federal, state, and local regulations" (Millennium Pipeline Co., L.L.C. v Seggos, 860 F3d 696, 698 [DC Cir 2017]). As relevant here, the NGA does not abridge the rights of states to establish water quality standards under the Clean Water Act (see 15 USC § 717b [d] [3]; 33 USC § 1313; Delaware Riverkeeper Network v Secretary Pennsylvania Dept. of Envtl. Protection, 833 F3d 360, 368 [3d Cir 2016]). Thus, an applicant for a federal certificate of public convenience and necessity in connection with a project that "may result in any discharge into the navigable waters," must provide FERC with "a certification from the State in which the discharge . . . will originate, . . . [indicating] that any such discharge will comply with the applicable provisions" of the state water quality standards (33 USC § 1341 [a] [1]).

With regard to eminent domain, the NGA provides that, when a certificate of public convenience and necessity is granted by FERC and the "holder" thereof "cannot acquire by contract . . . the necessary right-of-way to construct, operate, and maintain a pipe line . . . , it may acquire the same by the exercise of the right of eminent domain" (15 USC § 717f [h]). Under the NGA, a certificate holder may commence an eminent domain proceeding in either the applicable federal district court or a state court, with some limitations (15 USC § 717f [h]).

B.  The Eminent Domain Procedure Law

In New York State courts, the EDPL provides the "exclusive procedure by which property shall be acquired by exercise of the power of eminent domain" (EDPL 101). "Generally, a two-step process is required under the [EDPL] before a condemnor obtains title to property for public use" (Hargett v Town of Ticonderoga, 13 NY3d 325, 328 [2009]; see Matter of City of New York [Grand Lafayette Props. LLC], 6 NY3d 540, 543 [2006]). First, the condemnor "makes a determination to condemn the property after invoking the hearing and findings procedures" of EDPL article 2 (Hargett, 13 NY3d at 328). This entails various public procedures, including a public hearing "to inform the public and to review the public use to be served by a proposed public project and the impact on the environment and residents of the locality" (EDPL 201). The condemnor must then render findings regarding the project, including, its (1) public use, benefit, or purpose; (2) approximate location; (3) general effect on the environment and nearby residents; and (4) such other factors as the condemnor considers relevant (see EDPL 204 [B]). "The principal purpose of article 2 of the EDPL . . . is to [e]nsure that [a condemnor] does not acquire property without having made a reasoned determination that the condemnation will serve a valid public purpose" (Matter of Jackson v New York State Urban Dev. Corp., 67 NY2d 400, 417-418 [1986] [emphasis added]).

"A number of alternative procedures that a condemnor may undertake are outlined in EDPL 206, any one of which exempts the condemnor from compliance with article 2" (Grand Lafayette Props. LLC, 6 NY3d at 546-547). In particular, EDPL 206 (A) provides that:

"The condemnor shall be exempt from compliance with the provisions of . . . article [2] when:

(A) pursuant to other state, federal, or local law or regulation it considers and submits factors similar to those enumerated in [EDPL 204 (B)], to a state, federal or local governmental agency, board or commission before proceeding with the acquisition and obtains a license, a permit, a certificate of public convenience or necessity or other similar approval from such agency, board, or commission"

(emphasis added). Thus, under this provision, a condemnor need not duplicate public benefit review undertaken by a governmental agency, so long as the review considers factors similar to those relevant to the EDPL eminent domain analysis and results in approval of the project.

Once the prerequisites of article 2 are satisfied by either compliance with the hearing procedures or the application of an exemption, "the condemnor must seek the transfer of title to the property by commencing a judicial proceeding known as a vesting proceeding pursuant to EDPL article 4" (Hargett, 13 NY3d at 328). In conjunction with the vesting proceeding, the condemnor must file, among other things, "a statement providing either the compliance with the requirements of article [2] of th[e] [EDPL], . . . or a statement providing the basis of exemption from article [2]" (EDPL 402 [B] [3] [a]), an explanation of the public use, benefit or purpose for which the property is required, and a request that the court direct entry of an order authorizing the filing of an acquisition map, upon which title to the property shall vest in the condemnor (see EDPL 402 [B] [3] [d], [B] [3] [e]).

Meanwhile, if a condemnor issues public use findings and a determination under EDPL 204, an aggrieved party may seek judicial review in the relevant Appellate Division

Department (see EDPL 207 [a]).  Judicial review is limited to whether (1) the proceeding conformed with the federal and state constitutions; (2) the proposed acquisition is within the condemnor's statutory jurisdiction or authority; (3) the condemnor's determination and findings were made in accordance with the appropriate statutory procedures; (4) a public use, benefit or purpose will be served by the proposed condemnation (see EDPL 207 [C]). Furthermore, such judicial review must be completed "as expeditiously as possible and with lawful preference over other matters" (EDPL 207 [B]).

## II.

Turning to the appeal before us, in 2017, National Fuel commenced this EDPL vesting proceeding seeking to acquire, by eminent domain, temporary construction easements and a 50-foot wide permanent easement over certain property owned by respondent landowners Joseph and Theresa Schueckler in order to facilitate construction and operation of a natural gas pipeline.[2]  National Fuel asserted that it had unsuccessfully attempted to negotiate a purchase of the easement,[3] and that compliance with article 2 of the EDPL was satisfied through the statutory exemption set forth in EDPL 206 (A) based

---

[2]  Respondent Joseph Schueckler passed away during the pendency of this appeal. However, the parties agree that substitution is not necessary inasmuch as the property was owned by Joseph and Theresa as tenants by the entirety, and Joseph's property interest vested in any co-tenants by operation of law upon his death (see CPLR 1015 [b]; Matter of Estate of Violi, 65 NY2d 392, 395 [1985]; Paterno v CYC, LLC, 46 AD3d 788, 789 [2d Dept 2007]).

[3] At each stage of the EDPL process, the condemnor must "make every reasonable and expeditious effort to justly compensate [the landowner] . . . by negotiation and agreement" (EDPL 301; see EDPL 303).  Respondent landowners do not claim that National Fuel failed to negotiate in good faith.

upon FERC's issuance of a certificate of public convenience and necessity for the project under the NGA. National Fuel appended the FERC order issuing the certificate to its petition.

Respondent landowners contested National Fuel's EDPL petition, asserting that the certificate was ineffective because, while it authorized National Fuel to construct and operate the pipeline, such authority was conditioned upon "compliance with [certain] environmental conditions," including the requirement that, "[p]rior to receiving written authorization . . . to commence construction of any [p]roject facilities, National Fuel shall file with [FERC] documentation that it has received all applicable authorizations required under federal law (or evidence of waiver thereof)" (emphasis in original). According to respondents, this condition was not met—and the FERC certificate was therefore invalidated—due to the subsequent denial of National Fuel's application for a water quality certification by the New York Department of Environmental Conservation (DEC).

In response, National Fuel conceded that DEC had denied its application. However, National Fuel explained that it was seeking rehearing and clarification of the FERC order, as well as a ruling that DEC had waived its authority to deny the water quality certification by failing to timely decide National Fuel's application within the one-year period the Clean Water Act provides for review of such applications by state agencies (see 33 USC § 1341 [a] [1]).

Supreme Court granted National Fuel's EDPL petition, concluding that it had "made a prima facie showing of entitlement to the easements" based on the FERC certificate, which "exempt[ed] [National Fuel] from the requirements of [a]rticle 2 of the EDPL." That

court rejected the landowners' claim that the certificate was ineffective for eminent domain purposes because it was conditional, observing that the certificate conditioned "construction and operation of the pipeline"—as compared with the "issuance of the certificate"—on various prerequisites. With regard to DEC's denial, the court observed that "the issue is not whether National Fuel has or will be able to obtain the necessary water quality permits from DEC, but whether it may initiate eminent domain proceedings" and that "water quality permits may be a precondition to pipeline construction, but not to the initiation of eminent domain proceedings." Thus, the court held, National Fuel was exempt from the requirements of article 2 of the EDPL and was entitled to obtain the easements through eminent domain.

Upon the landowners' appeal, the Appellate Division—with two Justices dissenting—reversed and dismissed National Fuel's EDPL petition (167 AD3d 128 [4th Dept 2018]). That Court reasoned that DEC's denial of National Fuel's application for a water quality certification meant that "[National Fuel] no longer holds a qualifying federal certificate for purposes of the EDPL 206 (A) exemption" (167 AD3d at 136). The dissenting Justices would have affirmed the granting of National Fuel's petition, generally agreeing with Supreme Court's rationale.[4]

---

[4] During the pendency of the appeal before the Appellate Division, FERC ruled that DEC had waived its authority to either grant or deny National Fuel's application for a water quality certification by failing to determine it within one year of submission, effectively invalidating the denial for purposes of the FERC certificate. The Appellate Division majority acknowledged FERC's ruling, but declined to consider it because it was dehors the record and was still subject to appellate review. The dissenting Justices would have taken judicial notice of the intervening FERC ruling and observed that, even otherwise accepting the majority's analysis, the denial of the water quality certification no longer

National Fuel appealed to this Court (see CPLR 5601 [a]).[5]

### III.

Before this Court, National Fuel argues that the Appellate Division erroneously concluded that DEC's denial of its water quality certification application invalidated the FERC-issued certificate of public convenience and necessity for purposes of EDPL 206 (A). Alternatively, National Fuel contends that the Appellate Division erred by failing to take judicial notice of the intervening ruling by FERC that DEC waived its authority to issue or deny a water quality certification. We agree with National Fuel on the first point and, therefore, have no occasion to reach the second. The Appellate Division's holding that the FERC certificate did not demonstrate compliance with EDPL article 2 pursuant to EDPL 206 (A) contravenes the express language of that provision, undermines the purpose of the statutory exemption, and overlooks relevant federal case law concerning the effect of the certificate of public convenience and necessity.

---

presented any impediment to the effectiveness of the FERC certificate at the time the Appellate Division's review was complete.

[5] The Court of Appeals for the Second Circuit subsequently vacated DEC's water quality certification denial as lacking sufficient rational explanation, and that Court remitted the matter to DEC for the limited purpose of explaining the basis of the agency's decision (see 761 Fed Appx 68, 72 [2d Cir 2019]). The Second Circuit also observed that FERC and the District of Columbia Circuit Court would have exclusive jurisdiction over National Fuel's claim that the DEC had waived its authority to issue a water quality certification, and that National Fuel was "free to present any evidence of waiver to FERC in the first instance" (id. at 72). According to the parties, upon remittal by the Second Circuit, DEC again denied National Fuel's application. Meanwhile, FERC denied requests for rehearing or a stay of its waiver determination and reiterated that DEC's failure to decide the application within one year of its receipt resulted in a "waive[r of the agency's] authority to issue a water quality certification" (167 FERC ¶ 61007, ¶ 11 [April 2, 2019]).

It is well settled that, "'[w]hen presented with a question of statutory interpretation, [a court's] primary consideration is to ascertain and give effect to the intention of the Legislature'" (Samiento v World Yacht Inc., 10 NY3d 70, 77-78 [2008], quoting Matter of DaimlerChrysler Corp. v Spitzer, 7 NY3d 653, 660 [2006]). "'[T]he clearest indicator of legislative intent is the statutory text, [and] the starting point in any case of interpretation must always be the language itself, giving effect to the plain meaning thereof'" (Kuzmich v 50 Murray St. Acquisition LLC, 34 NY3d 84, 91 [2019], quoting Majewski v Broadalbin-Perth Cent. School Dist., 91 NY2d 577, 583 [1998]). Generally, "courts should construe unambiguous language to give effect to its plain meaning" (Matter of DaimlerChrysler Corp., 7 NY3d at 660).

The text of EDPL 206 (A) requires that, in order to obtain the benefit of the statutory exemption from article 2 procedures, a condemnor must establish that it "consider[ed] and submit[ted] factors similar to those enumerated in [EDPL 204 (B)], to a state, federal or local governmental agency, board or commission . . . and obtain[ed] a license, a permit, a certificate of public convenience or necessity or other similar approval" (EDPL 206 [A]). Here, National Fuel did exactly as the statute dictates; it submitted materials to FERC concerning the public benefit, use, and need for the proposed pipeline. While the dissent may question FERC's resulting conclusion, it can hardly be disputed that FERC considered each factor identified in EDPL 204 (B)—i.e., the public use, benefit or purpose to be served; the approximate location of the project; the general effect of the proposed project on the environment and residents; and such other relevant factors (see EDPL 204 [B]). More specifically, FERC considered the positions of numerous stakeholders, including the

DEC itself, and analyzed whether the pipeline project would have sufficient financial support, adversely impact existing customers, meet new demand or provide other benefits to the natural gas market, and whether and how the pipeline would impact landowners, surrounding communities, and the natural environment.  FERC prepared a 199-page environmental assessment as part of its review, which involved consideration of public comments and of various potential modifications of the proposal, and which took into account how the project might affect—among other things—local "geology, soils, water resources, wetlands, vegetation, fisheries, wildlife, threatened and endangered species, land use, recreation, visual resources, cultural resources, socioeconomics, air quality, noise, [and] safety."  FERC concluded that the project did "not constitute a major federal action significantly affecting the quality of the human environment" and, thus, an environmental impact statement was not required under the National Environmental Policy Act.[6]  Following its lengthy review, FERC determined that the public benefits of the pipeline project outweighed any adverse impacts and, accordingly, issued a certificate of public convenience and necessity to National Fuel.  This certificate was incontrovertibly premised upon a meaningful review of substantial information, alternatives, and viewpoints of various stakeholders, and FERC's analysis focused largely on the factors delineated in EDPL 204 (B).  Given that FERC made a reasoned determination regarding

---

[6] Approximately 69% of the pipeline will be co-located with existing pipeline and powerline right-of-ways.

the public benefit to be served, as envisioned by EDPL 204 (B), the certificate satisfied the plain language of EDPL 206 (A).[7]

While it is true that the certificate of public convenience and necessity contains numerous "conditions"—including, that of obtaining a water quality certificate and other pre-construction conditions that might affect the ultimate completion of the project—these conditions cannot reasonably be understood to render the certificate provisional for purposes of eminent domain, as the dissent suggests (see dissenting op., at 11), inasmuch as they are not conditions precedent to the validity of the certificate itself.  Notably, the certificate otherwise clearly delineates those circumstances in which FERC sought to prevent National Fuel from taking a particular act until after some condition was satisfied. Indeed, some of the "conditions" in the FERC certificate cannot be met without possession of the land.[8]  FERC could have conditioned National Fuel's eminent domain authority on the completion of some act or obligation (see e.g. Mid Atl. Express, LLC v Baltimore County, Md., 410 Fed Appx 653, 657 [4th Cir 2011]), but the "condition" that National Fuel comply with various environmental requirements—including the receipt of a water quality certification—"[p]rior to receiving written authorization . . .  to commence

_____

[7]  Insofar as we expressly conclude that FERC's review did, in fact, consider all of the relevant factors identified by EDPL 204 (B), the dissent's assertion that our holding can be read as authorizing a condemnor to obtain title to private land through the "mere issuance of any government approval" or "by merely acquiring a local permit unrelated to the environmental impact of the project" finds no support here (dissenting op., at 13).

[8] Many of the "conditions" set forth in the certificate, such as the requirement that National Fuel provide regular project reports to FERC during construction, are simply obligations placed on National Fuel, not conditions precedent.

construction" (emphasis added) does not, by its plain terms, curtail National Fuel's right to proceed with eminent domain in accordance with the EDPL. Thus, neither the EDPL nor the terms of the FERC certificate preclude National Fuel from pursuing eminent domain before all pre-construction conditions have been fulfilled.

Ultimately, since before commencement of the vesting proceeding, and continuing to the present day, National Fuel has held a valid certificate of public convenience and necessity issued by FERC—after extensive review of the factors set forth in EDPL 204 (B)—that does not qualify or condition its exercise of eminent domain upon receipt of a water quality certification. Therefore, under the express terms of EDPL 206 (A), National Fuel qualified for statutory exemption from EDPL article 2 procedures.

To reach a contrary conclusion, the Appellate Division majority looked beyond the facial validity of the FERC certificate and analyzed National Fuel's compliance with the certificate's conditions. However, the language of EDPL 206 (A) neither requires nor authorizes any such analysis under these circumstances, and reasonably so. A requirement that courts undertake extensive scrutiny of an agency's public use review and findings—rather than ascertaining, as the plain text of EDPL 206 (A) dictates, whether the agency appropriately considered the factors of EDPL 204 (B)—would completely negate the legislatively-intended benefits of EDPL 206 (A), including the avoidance of duplicative review, the reduction of costs associated with the development of public works, and efficient and timely resolution of condemnation claims (cf. EDPL 207 [B]). The objective of EDPL 206 (A) is not to ensure that a project has "final unconditional approval" or a "final green light" (dissenting op., at 4, 7) but, rather, to make certain that there has been

sufficient review of the project's public purpose and approval thereof by a governmental agency. Thus, we are not persuaded that a limitation should be read into EDPL 206 (A) requiring courts to inquire—after a public use determination has been rendered by an agency—into the likelihood that a project will be completed based on any and all pending conditions or permit applications.

To be sure, the Appellate Division's concern that the power of eminent domain should be exercised only for viable projects is legitimate; both our state and federal constitutions permit the taking of property by eminent domain only for public use (see NY Constitution art I, § 7; US Constitution, Fifth Amendment)[9] and any exercise of eminent domain involves a careful balancing of the interests of property owners, the community, and the public use to be served (see EDPL 101). However, in enacting the statutory exemption set forth in EDPL 206 (A), the legislature recognized that eminent domain is, at its core, intended to advance public works and that, in connection with such public projects, government agencies may often render determinations of public use that typically need not be replicated. Where, as here, a state or federal agency has determined that a project serves a public use, duplicative and exacting review of that determination would contravene the statutory framework prioritizing efficient resolution of condemnation claims for the greater public good (see EDPL 206 [A]).

Moreover, the legislature was aware of the risk that property might be taken through the exercise of eminent domain for a public use that ultimately does not come to fruition,

---

[9] Respondent landowners raise no constitutional challenge to the proceedings below.

and it accounted for such a possibility in the EDPL.  For example, if a condemnor abandons a project for which property was acquired by eminent domain, EDPL 406 provides that "the condemnor shall not dispose of the property or any portion thereof for private use within ten years of acquisition without first offering the former fee owner of record . . . a right of first refusal to purchase the property at the amount of the fair market value" (EDPL 406 [a]; see Bill Jacket, L 1977, ch 839, Letter from Milton Albert [July 5, 1977]).  Thus, the statutory framework provides a safeguard for property owners in the event of an abandoned public use project, reflecting legislative awareness that an affirmative public use determination under EDPL article 2 does not guarantee the success of such project.

In addition to reading language into EDPL 206 (A) that contradicts the statutory text, an affirmance here would require us to adopt the mistaken proposition that DEC's denial of the water quality certification negated the FERC certificate of public convenience and necessity issued to National Fuel.  As already noted, although FERC may place conditions on a certificate holder's exercise of the eminent domain power (see e.g. Mid Atl. Express, LLC, 410 Fed Appx at 657), this FERC certificate requires National Fuel to demonstrate compliance with federal permitting requirements, including the Clean Water Act, only prior to construction (see e.g. Delaware Riverkeeper Network v Fed. Energy Regulatory Commn., 857 F3d 388, 398-399 [DC Cir 2017]; Transcontinental Gas Pipe Line Co., LLC v Permanent Easement for 2.14 Acres, 2017 WL 3624250, *6, 2017 US Dist LEXIS 134851, *19-*20 [ED Pa Aug. 23, 2017], affd 907 F3d 725 [3d Cir 2018], cert denied __ US __, 139 S Ct 2639 [2019]; Constitution Pipeline Co., LLC v A Permanent Easement for 0.67 Acres & Temporary Easement for 0.68 Acres in Summit, Schoharie

County, N.Y., 2015 WL 1638477, *2, 2015 US Dist LEXIS 50548, *7 [ND NY Feb. 21, 2015]). National Fuel's failure to satisfy this condition on construction of the pipeline prior to initiation of the vesting proceeding does not invalidate the certificate of public convenience and necessity for purposes of EDPL 206 (A) or nullify FERC's determination of public use embodied therein.[10] A FERC order is final and effective as a matter of federal law until it is stayed by FERC, itself, or an appropriate reviewing federal court (see 15 USC § 717r [c]; Tennessee Gas Pipeline Co. v Massachusetts Bay Transp. Auth., 2 F Supp 2d 106, 109 [D Mass 1998]) and, generally, compliance with a FERC-issued certificate is, in the first instance, a question for FERC's determination. Under the circumstances presented here, where the certificate does not place a condition precedent on the holder's exercise of eminent domain, a collateral attack on the certificate or the condemnor's compliance therewith is not properly litigated in an EDPL proceeding (cf. Gas Transmission Northwest, LLC v 15.83 Acres of Permanent Easement More or Less, located in Morrow County, 126 F Supp 3d 1192, 1198 [D Or 2015]; Millennium Pipeline Co.,

---

[10] Federal courts addressing similar conditions in FERC certificates of public convenience and necessity, in connection with eminent domain proceedings commenced in federal court, have consistently held such conditions may not operate as a shield against the eminent domain power granted by the NGA (see e.g. PennEast Pipeline Co., LLC v Permanent Easement of 0.06 Acres in Moore Twp., Northampton County, Pennsylvania, 2019 WL 4447981, *5, 2019 US Dist LEXIS 158149, *18-*20 [ED Pa Sept. 17, 2019]; Sabal Trail Transmission, LLC v 7.72 Acres in Lee County, Alabama, 2016 WL 3248666, *4, 2016 US Dist LEXIS 77055, *14 [MD Ala June 8, 2016]; Gas Transmission Northwest, LLC v 15.83 Acres of Permanent Easement More or Less, located in Morrow County, 126 F Supp 3d 1192, 1198 [D Or 2015]; Portland Nat. Gas Transmission Sys. v 4.83 Acres of Land, 26 F Supp 2d 332, 335-336 [DNH 1998]; Tennessee Gas Pipeline Co. v 104 Acres of Land More or Less, in Providence County of State of R.I., 749 F Supp 427, 433 [DRI 1990]; see also Millennium Pipeline Co., L.L.C. v Certain Permanent and Temporary Easements, 777 F Supp 2d 475, 479 [WD NY 2011], affd 552 Fed Appx 37 [2d Cir 2014]).

L.L.C. v Certain Permanent and Temporary Easements, 777 F Supp 2d 475, 481 [WD NY 2011], affd 552 Fed Appx 37 [2d Cir 2014]).  To conclude otherwise would be inconsistent with the carefully crafted EDPL framework.

Notably, this appeal illustrates the problems that would arise if courts were to begin determining—independent of FERC and in the absence of a certificate that expressly places conditions on the right to proceed with eminent domain—when and which conditions of a FERC certificate of public convenience and necessity (or conditions imposed by other agencies on construction of public works that have received what is the equivalent of an affirmative determination of public benefit) must be satisfied prior to the commencement of an EDPL proceeding.  Here, at every level of the state court proceedings, intervening FERC and federal court decisions have impacted the interplay between DEC's denial of the water quality certification and the FERC certificate.  Further, it is impractical to litigate in an EDPL proceeding whether a particular condition will be satisfied within the requisite time for construction of the project pursuant to the FERC certificate.  Although DEC denied National Fuel's application, it could have reconsidered if National Fuel had revised and resubmitted its application, and DEC's denial was, in any event, subject to federal judicial review—which ultimately led to its vacatur by the Second Circuit Court of Appeals.  Any conclusion that this FERC certificate was rendered invalid or ineffective, or that the pipeline project was effectively defeated, by the denial of the water quality certification would be entirely speculative, as the intervening federal proceedings have demonstrated.

Of course, as the Appellate Division observed, the federal reservation of the right of states to issue water quality certifications was intended to "continu[e] the authority of

the State . . . to act to deny a permit and thereby prevent a Federal license or permit from issuing to a discharge source within such State" (S.D. Warren Co. v Maine Bd. of Envtl. Protection, 547 US 370, 380 [2006] [internal quotation marks and citation omitted]). Here, however, while DEC retained authority to grant or deny National Fuel's application for a water quality certification (unless deemed waived), such authority did not extend either to invalidating a previously issued FERC certificate of public convenience and necessity where FERC placed no such conditions on the certificate's effectiveness or to blocking eminent domain that might otherwise properly proceed under the certificate and the EDPL. It remains within FERC's purview to determine the effect of the DEC's denial on National Fuel's certificate of public convenience and necessity, and to stay or revoke the certificate if it deems it appropriate to do so.

IV.

In sum, where, as here, a gas company holds a valid certificate of public convenience or necessity from FERC for the proposed construction of a pipeline and that certificate places no relevant conditions on the eminent domain power and has not been stayed or revoked by FERC or a federal court properly reviewing its issuance, compliance with article 2 is excused under EDPL 206 (A). In light of our conclusion, we have no occasion to address whether the Appellate Division erred by declining to take judicial notice of the FERC waiver determination, and we do not reach that issue. Respondent landowners' remaining arguments lack merit. Accordingly, the order of the Appellate Division should be reversed, with costs, and the order of Supreme Court reinstated.

Matter of National Fuel Gas Supply Corp. v Schueckler

No. 29

RIVERA, J. (dissenting):

Petitioner National Fuel Gas Supply Corp. wants to build a transborder gas pipeline across dozens of creeks and streams in Western New York, and to that end it sought easements on land owned by respondents Joseph A. and Theresa F. Schueckler. The Schuecklers refused to voluntarily sell their possessory use or full ownership rights to the

- 1 -

Corporation.  That might have been the end of the story, because if an owner refuses an offer to purchase, the prospective buyer is generally left out in the cold (see Loretto v Teleprompter Manhattan CATV Corp., 458 US 419, 435 [1982] ["The power to exclude has traditionally been considered one of the most treasured strands in an owner's bundle of property rights"]; J.E. Penner, The "Bundle of Rights" Picture of Property, 43 UCLA L Rev 711, 746-750 [1996]; Katrina M. Wyman, In Defense of the Fee Simple, 93 Notre Dame L Rev 1, 11 [2017]).  Not so here.

After the Schuecklers refused to sell part of their homestead land, the Corporation commenced a proceeding to vest title in itself, invoking New York's eminent domain power to condemn private property for public use.  However, because New York had not completed its water quality certification assessment for the pipeline project, as required by the federal Clean Water Act (see 33 USC § 1341 [a] [1]), amongst other outstanding environmental impact reviews, the Corporation failed to provide complete information regarding "the general effects of the proposed project on the environment and residents of the locality" as required by New York's Eminent Domain Procedure Law (EDPL 204 [B] [3]).  Therefore, the Appellate Division properly held that the proceeding to vest title was premature.

In concluding that the Corporation may rely on a Federal Energy Regulatory Commission certificate to satisfy its burden under the EDPL, even though the certificate expressly conditions the project on completion of additional federal and state mandatory assessments with the potential to stop the project, the majority measures the certificate by its title, the equivalent of "judging a book by its cover."  Metaphorically, and as a matter

of law, no good can come from this.  Indeed, the majority misinterprets the federal regulatory process and the EDPL condemnation framework, and in so doing sanctions the condemnation of private property for development projects that may never gain final approval.  I do not see how the public benefits from the premature taking of private land, and therefore I dissent.

I.

The Parties and the Proposed Gas Pipeline Project

The Schuecklers, a married couple, resided upon and owned as tenants by the entirety two hundred acres of forested property in Alleghany County in Western New York State.  National Fuel Gas Supply Corporation ("the Corporation") is a large fossil fuel company, and a subsidiary of the publicly traded National Fuel Gas Company.  It intends to build a pipeline (called "Northern Access") stretching across ninety-nine miles of Pennsylvania and New York.  The pipeline's capacity is intended to be used by Seneca Resources, an affiliate of the Corporation, to transport natural gas, largely to Canada. Construction will entail clear-cutting a seventy-five-foot-wide swath along the length of the proposed pipeline, including a stretch across the middle of the Schueckler forested property.

In accordance with the requirements of the National Gas Act (NGA), the Corporation applied for and obtained a Federal Energy Regulatory Commission (FERC) certificate of public convenience and necessity for the project (see 15 USC 717f [C]; 18 CFR § 157.1 et seq.).  The Corporation then sought to purchase easements on the

Schuecklers' land. They refused the offer, and so the battle to keep their property from the Corporation began.

II.

The FERC Certificate and Acquisition of Private Property under New York's Eminent Domain Law

To justify the exercise of the state's power of eminent domain for an ostensibly private commercial enterprise, the Corporation relied on the FERC certificate. The majority concludes that this certificate is sufficient under the EDPL to support vesting title in the Corporation to the Schueckler land. The majority's analysis is flawed in at least two respects. First, it assumes that this certificate grants final unconditional approval of a static project. In fact, the certificate recognizes that the project is subject to additional evaluation under the Clean Water Act, which grants New York the right to halt the project if it denies the Corporation a water quality certification (WQC) based on the state's preconstruction environmental review. Second, the majority analysis turns on a misreading of the EDPL as prohibiting judicial consideration of the underlying terms of this FERC certificate to determine whether FERC granted approval after considering the factors set forth in EDPL 204 (B). That limitation on the court's review power is in contravention of the legislative purpose, the exclusive eminent domain condemnation procedure, and the condemnor's statutorily-fixed pre-acquisition burden, all of which make clear that a court must confirm that the applicable statutory factors have been considered and addressed.

A. FERC Certificate of Public Convenience and Necessity

The majority accurately summarizes the NGA and FERC's statutory authority to review gas pipeline applications, but fails to account for the fact that issuance of this FERC certificate of public convenience and necessity is provisional and part of a dynamic process. Indeed, the FERC certificate at issue here has gone through numerous and varied pre- and post-filing design changes. As the certificate recounts, the project details were subject to negotiation, amendment, clarification, and modifications, all in response to FERC and the concerns of stakeholders. At the end of this stage of the process, FERC issued a provisional certificate, which approved the Corporation's application for its proposed pipeline project, subject to "environmental and other conditions," some of which involve preconstruction assessments which, if unfavorable to the Corporation, may prevent completion of the project.

In part, the changes to the early pipeline design reflect that this is a controversial project that has garnered substantial opposition. According to the certificate, the pipeline was opposed by numerous groups and stakeholders, who "question[ed] the need for the [pipeline] because much of the project's . . . service will be used to transport gas to Canada," such that it would "only . . . benefit [the Corporation's affiliates'] shareholders," and argued "that the project imposes burdens on the U.S. public without providing proportional benefits to U.S. consumers."[1]

---

[1] The numerous stakeholders who commented upon the proposed project during FERC proceedings included the Allegheny Defense Project; the Town of Pendleton, New York; the Pennsylvania Alliance for Clean Water and Air; and New York State's Department of Environmental Conservation, as well as numerous individuals.

Stakeholders also criticized FERC's handling of the project application, including, with particular relevance to this appeal, FERC's decision to forego preparation of an Environmental Impact Statement, relying instead on its staff's environmental assessment. An "environmental impact statement" is "a detailed statement describing the environmental impact of the proposed action"; under the National Environmental Policy Act of 1969, an agency is required to create such a statement "upon proposing a 'major federal action' that will 'significantly affect the quality of the human environment'" (Pogliani v U.S. Army Corps of Engineers, 306 F3d 1235, 1237 [2d Cir 2002], quoting 42 USC § 4332 [2] [C]). In contrast, an "environmental assessment" is "a concise public document . . . that serves to," among other things, "[b]riefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact," and to "[f]acilitate preparation of a statement when one is necessary" (40 CFR § 1508.9). Various stakeholders challenged FERC's decision as legally incorrect and criticized the environmental assessment as based on incomplete information.

Despite the objections to the project, FERC issued the certificate to the Corporation, subject to conditions. Specifically, the Corporation must "file with the Secretary documentation that it has received all applicable authorizations required under federal law (or evidence of waiver thereof)." FERC has no discretion to supplant the federal statutory approvals independent of the FERC certification process because FERC "must ensure that the project complies with the requirements of all relevant federal laws, including . . . the

Clean Water Act" (Islander E. Pipeline Co., LLC v Connecticut Dept. of Envtl. Prot., 482

F3d 79, 84 [2d Cir 2006]).  In turn, the Clean Water Act provides that

> "[a]ny applicant for a Federal license or permit to conduct any
> activity including, but not limited to, the construction or
> operation of facilities, which may result in any discharge into
> the navigable waters, shall provide the licensing or permitting
> agency a certification from the State in which the discharge
> originates or will originate . . . that any such discharge will
> comply with the applicable provisions of sections
> 1311, 1312, 1313, 1316, and 1317 of this title. . . . If the State,
> interstate agency, or Administrator, as the case may be, fails or
> refuses to act on a request for certification, within a reasonable
> period of time (which shall not exceed one year) after receipt
> of such request, the certification requirements of this
> subsection shall be waived with respect to such Federal
> application. *No license or permit shall be granted until the
> certification required by this section has been obtained or has
> been waived as provided in the preceding sentence. No license
> or permit shall be granted if certification has been denied by
> the State, interstate agency, or the Administrator, as the case
> may be*" (33 USC § 1341 [a] [1] [emphasis added]).

As is evident from the express language of the Clean Water Act, Congress granted to the

states project-ending authority.  FERC's certificate cannot displace federal law and New

York State's rights of assessment thereunder.

As the above discussion establishes, the FERC certificate issued to the Corporation

here is not the culmination of a completed approval process but rather a step in a multi-

level review which requires additional approvals in accordance with federal and state laws.

This FERC certificate allows the Corporation to seek the required approvals, but it does

not give a final green light to the proposed project.  Indeed, as the Corporation concedes,

it may negotiate and reconfigure the details of the project to acquire the necessary

outstanding administrative approvals.  That FERC is the "lead agency" but does not

complete the actual environmental reviews (see Majority Op at 3 n 1) confirms that without the additional mandatory assessments or legally effective waivers, the project cannot be realized.

## B. EDPL Article Two Requirements

Individual property rights are a central organizing principle of our legal system, which assiduously protects owners against unwanted interference with their rights of enjoyment and use (see Lynch v Household Fin. Corp., 405 US 538, 552 [1972] ["That rights in property are basic civil rights has long been recognized"]; see e.g. RPAPL § 601 [plaintiff in action for recovery of real property may also obtain damages]; People v Kane, 131 NY 111 [1892] [holding that right to exclusive possession may be defended against trespass by acts constituting destruction of property or even assault and battery]; see also O. Lee Reed, What Is "Property"?, 41 Am Bus L J 459, 473-475 [2004]).  Nevertheless, if FERC issues a certificate, the NGA allows a gas company to rely on eminent domain to obtain property necessary for completion of a pipeline project (15 USC § 717f [h]).  Under settled legal principles, regardless of the forum, exercise of the power of eminent domain is justified so long as the project is for a public use, as determined through consideration of the project's benefits to the public and the potential impacts on the environment (see EDPL 101, 204; Brody v Vill. Of Port Chester, 434 F3d 121, 127, 135 [2d Cir 2005]).[2]

---

[2] The majority states that "eminent domain is, at its core, intended to advance public works" (majority op at 15).  No doubt.  As such, we must be careful when faced with a condemnation in service of a commercial enterprise with purported public benefits.  For this reason, as explained herein, the EDPL provides a mechanism for our courts to ensure that private property is acquired for a properly approved purpose.

In New York, the EDPL provides the exclusive procedure for acquisition of private property for public use by means of the state's eminent domain power and requires the condemnor to demonstrate that the project's benefit to the community-at-large outweighs the landowner's interests. Specifically, and in accordance with the statutory purpose, a condemnor must satisfy a rigorous review process intended to "give due regard to the need to acquire property for public use as well as the legitimate interests of private property owners, local communities and the quality of the environment, and to that end to promote and facilitate recognition and careful consideration of those interests" (EDPL 101).

As set forth in EDPL article two, a condemnor must hold hearings and make findings that include, but are not limited to,

> "(1) the public use, benefit or purpose to be served by the proposed public project; (2) the approximate location for the proposed public project and the reasons for the selection of that location; (3) the general effect of the proposed project on the environment and residents of the locality; [and] (4) such other factors as it considers relevant" (EDPL 204 [b]).

A party affected by the findings may challenge them by filing a petition in the Appellate Division "in the judicial department embracing the county wherein the proposed facility is located" (EDPL 207 [A]). The Appellate Division is empowered to review the merits of the "public use, benefit or purpose" findings made by the condemnor, as well as the condemnor's statutory authority and procedural compliance, and the constitutionality of the proceedings (EDPL 207 [C]).

Under section 206, a condemnor may avoid the section 204 hearing and findings requirement if, inter alia, it has completed a government approval process that requires it

to "submit[] factors similar to those enumerated in" EDPL 204 (B) (EDPL 206 [A]).

Section 206 (A) specifically provides that

> "[t]he condemnor shall be exempt from the hearing and findings requirement of EDPL 204 when, . . . pursuant to other state, federal, or local law or regulation it considers and submits factors similar to those enumerated in [EDPL 204 (B)], to a state, federal or local governmental agency, board or commission before proceeding with the acquisition and obtains a license, a permit, a certificate of public convenience or necessity or other similar approval from such agency, board, or commission.

Thus, the EDPL conditions avoidance of the hearings and findings requirement on the condemnor's acquisition of, among other things, a "certificate"—not, as the majority's conclusion allows, what practically and effectively is a <u>conditional certificate</u>.

Essentially, the EDPL permits an alternative process comparable to that set forth in section 204—one that serves the statutory purpose to scrutinize the project to determine whether it justifies the condemnor's acquisition of private property through eminent domain. The framework eliminates the cost and burden associated with section 204 hearings when the condemnor has completed a government assessment that provides for similar quantitative and qualitative levels of project review. As a result, a certificate or other permit may or may not satisfy EDPL 206 (A), depending upon whether the agency's review process provides an adequate substitute for the consideration of the EDPL 204 (B) factors through the normal process.[3]

---

[3] Thus, the majority's conclusion that the certificate is valid is beside the point. The question before the Court is whether the certificate complies with the EDPL. For the reasons discussed infra, the certificate falls short because FERC's approval of the

The Corporation's reliance on the FERC certificate to satisfy section 206 is misplaced because, as discussed above, FERC is not authorized to conduct the entire range of environmental impact review required for the project. Congress through the Clean Water Act leaves to New York State part of this task (see 33 USC § 1341 [a] [1]). Because Congress has specifically given New York State authority over major parts of the environmental review applicable to projects like this one, FERC had no authority to displace that process by issuance of the certificate here, nor did it purport to do so in this case.[4] Since the Corporation filed its vesting proceeding when its application for a water quality certification was still pending before New York State's Department of Environmental Conservation (DEC), the FERC certificate, although valid for its federal purpose, could not be used to satisfy the Corporation's burden as condemnor under the EDPL.

To be sure, not every matter left for future resolution renders a government approval invalid for section 206 purposes. For example, post-construction conditions may be irrelevant to whether the public's beneficial use is sufficiently compelling to overcome the private interests, or preconstruction conditions may not effect project feasibility or be of the type that would affect a determination regarding factors similar to those listed in section

_____

Corporation's pipeline project is conditioned on the exercise or waiver of New York State's rights under the Clean Water Act. Compliance with the Clean Water Act is not a precondition to the certificate's validity, but it is a limiting condition on the project's completion. It also means that FERC's environmental assessment is incomplete for purposes of the EDPL until New York State acts.
[4] The FERC certificate acknowledges that its environmental assessment process "is not intended to replace the Clean Water Act air permitting process."

204. However, where, as here, the FERC certificate is conditioned on New York State's federally mandated independent environmental assessment, and that condition is outstanding at time of filing, the FERC certificate does not satisfy section 206. It bears stating the obvious that, because the condition attends to pollutant discharge into New York's waters, it falls squarely within the interests identified in the EDPL's statement of purpose and section 204, both of which reference the quality of the environment as a matter that must be considered and addressed by the condemnor. Further, the Clean Water Act assessment conducted by DEC is not a trivial matter or one that has marginal effect on a project. Instead, as the Corporation tacitly concedes, the project cannot move forward without a WQC or a valid waiver of the WQC process.

The majority's conclusion that the section 206 alternative process strips the court of its authority to consider whether the condemnor has satisfied the requirements of article two—or, in the words of the majority, it "neither requires nor authorizes . . . courts to inquire . . . into the likelihood that a project will be completed based on . . . pending conditions or permit applications" (Majority Op at 14-15)—ignores the simple fact that the relevant part of section 206 renders compliance with 204 unnecessary only if the condemnor "considers and submits factors similar to those enumerated in" section 204 (EDPL 206 [A]).[5] Thus, a condemnor may only avoid its burden to hold hearings and make findings in accordance with section 204 through this exception if a government entity does

---

[5] For the same reason, and contrary to the majority's assertion, EDPL 206 (A) does not require an agency determination "equivalent [to] an affirmative determination of public benefit" (majority op at 18). It requires that the agency documentation relied upon by the condemnor establish that the EDPL factors were considered.

the same job *and*, based on that process, it issues an appropriate documentation of approval. When the Corporation filed its vesting action, the DEC had not completed its assessment and no WQC had been granted or denied. An example makes the point even more clearly. Suppose the Corporation sought to justify acquisition of title by satisfying section 204. It would have to hold hearings and make findings about the environmental impact of its project, including matters DEC must consider in assessing a request for a WQC. The Corporation could not satisfy section 204 unless it considered and addressed those matters in its findings in support of condemnation. In the same vein, the Corporation cannot rely on the FERC certificate that has, by law, deferred to New York State's Clean Water Act assessment.

Rather than limit the holding on this appeal to the narrow question before us— namely whether this specific FERC certificate, issued for this unique gas pipeline project, satisfies the EDPL—the majority unnecessarily and without legal support cabins the power of judicial review to reach the sweeping conclusion that any government document, regardless of content, restrictions and limited scope of approval, absolves the condemnor of the requirements of section 204. If the mere issuance of any government approval document is sufficient on its face to meet the statutory demands of article two, the Corporation could acquire title to the Schueckler land by merely acquiring a local permit unrelated to the environmental impact of the project. That would conflict with the legislature's intent that environmental matters be given due consideration before private property may be acquired for public use (see EDPL 101). Indeed, while the certificate may be a valid exercise of FERC's administrative authority, that authority is subordinate to the

demands of the Clean Water Act, which requires an additional state-based review of a factor specifically identified in the EDPL.

The majority disputes my characterization of the effect of its approach, but does so by doing exactly what it repudiates, namely, inquiring into FERC's review of the Corporation's submissions to determine whether FERC adequately considered the EDPL 206 (B) factors (majority op at 11-13 & n 7). The majority inexplicably criticizes the Appellate Division majority for conducting the very analysis conducted in the ruling here, leaving lower courts to wonder whether to do as the Court of Appeals says or as it does (see id. at 14). In any event, the majority's discussion of FERC's consideration of the facts elides the operative reality in this case: Congress has explicitly assigned the job of considering the project's environmental impacts in part to New York State, and neither this Court nor FERC can override that federal legislative authorization.

Aside from the fact that the majority's reading undermines the purpose of the EDPL by allowing for involuntary transfer of title without complete vetting of the issues that underlie the public use analysis, the majority ignores the plain language of section 206, and in so doing violates canons of construction that we must give meaning to all the words chosen by the legislature and interpret a statute to achieve its legislative goals (see Golden v Koch, 49 NY2d 690, 694 [1980] [stating that under "traditionally accepted standards of statutory construction," courts must "read [a statute] as a whole" and consider "each word"]; McKinney's Cons Laws of NY, Book 1, Statutes §§ 97, 98). If, as the majority concludes, courts have no judicial role other than to confirm the existence of a government document approving something—anything—then the legislature would have no reason to

include the circumscribing language that the nonexhaustive list of section 204(b) factors must be "consider[ed] and submit[ted]," leading to the government entity's approval (EDPL 206 [A]). Reading that language out of section 206 is not only impermissible, it also renders this provision ineffective and weakens the protections against condemnations for proposed projects that fail to adequately address the statutory factors. But the EDPL protects property owners and the community, not condemnors, who must make a showing that upon consideration of the private and public interests there exists a public use justifying acquisition of private property. Put another way, the majority approach fails to give due regard to the property owner and local community concerns as well as the project's impact on the environment—in direct contravention of the statutory purpose "to promote and facilitate recognition and careful consideration of those interests" (EDPL 101).

The majority's analysis, taken to its logical end, would mean that the Corporation— or any party who obtains a document that, no matter its contents or conclusions, is denominated "certificate" from a single agency for a private commercial enterprise—could condemn private property and vest title in itself, even without all the necessary government approvals and even if the project is subsequently disapproved and never completed. The "book to be judged by its cover" in these situations, according to the majority, is the government administrative document titled a certificate. That harsh, unprecedented, and unfair result falls most heavily on a private owner with limited means, who simply wants to maintain and enjoy their land free of corporate environmental degradation.

To support its unsupportable conclusion, the majority emphasizes that in issuing the certificate, FERC did not place restrictions upon the Corporation's ability to exercise eminent domain under the NGA. That is true, and as a result, the Corporation became the unusual type of private entity which could use New York's eminent domain procedures to seize privately owned land.[6] This fact, however, does not bear at all under the EDPL as written on whether the Corporation actually complied with those procedures. In other words, the NGA clearly does not give the Corporation greater status with respect to exercise of eminent domain than a municipality or the state itself. In any case, the record does not reveal any reason why the *timing* of eminent domain, as distinct from the *authority* to exercise eminent domain, would be relevant for FERC's administrative review purposes; it is patently nonsensical to expect the FERC certificate to address every element of eminent domain procedure.[7] In sum, by creating from whole cloth an apparent rule that

---

[6] Contrary to the majority's view, my analysis does not question the validity of FERC's certificate. In describing the background and challenges to the Corporation's pipeline project, I do not consider, as the majority does (see majority op at 11-12), whether FERC's decision is reasonable; that determination is beyond this Court's authority. Nor do I assume the majority favors the premature taking of private property merely because the majority extols the scope of FERC's review (see id.). Our respective focus is on proper application of our state law, and on that front there can be no dispute that eminent domain may be exercised to acquire property over an owner's objection only when there is a public need that outweighs the private interest (see EDPL 101). The discrete question presented in this appeal is whether the Corporation may acquire title to the Scheuckler land on the basis that the Corporation complied with the EDPL's requirements. For the reasons I discuss supra, the validity of FERC's certificate as a provisional federal approval of the project does not answer that question.

[7] The majority's apples-and-oranges citation to an unpublished federal opinion, Mid Atl. Express, LLC v Baltimore County, Md. (410 Fed Appx 653 [4th Cir 2011]), does not affect this analysis. That FERC decided in a particular factual context that it would be appropriate to impose a limitation upon a company's exercise of eminent domain sheds no light upon

any "certificate of public convenience and necessity" satisfies EDPL 206 (a) unless the issuing agency explicitly conditions the exercise of eminent domain, the majority ignores the fundamental principle that courts may not rewrite duly enacted statutes (see McKinney's Cons Laws of NY, Book 1, Statutes § 73; Matter of Anonymous, 40 NY2d 96, 102 [1976]).

The majority's reliance on a different section of the EDPL to shore up its construction of article two is misplaced.  The majority argues that because section 406 grants an owner the right to repurchase property should the project be abandoned, we must read the EDPL as allowing involuntary title transfers for projects that may eventually fail.  That position misses the mark.  First, it is unclear that failure to acquire the necessary approvals constitutes "abandonment" of a project for purposes of the EDPL.  For example, the project could be redesigned and go forward without the need to condemn the owner's property.  Second, the property buy-back allowed by section 406 applies only if condemnation was properly exercised, meaning 406 provides a limited remedy to an owner where the public use initially justified acquisition of the property, but the condemnor subsequently deserts the project.  Here, the Corporation failed to satisfy the requirements of EDPL article two: the Corporation did not hold hearings and make findings in accordance with section 204, nor does the FERC certificate comply with section 206.  The limited remedy of section 406 is simply irrelevant on these facts.  Third, the remedy has limited impact and works best for those who are able financially to buy back their land and

---

its decision not to do so on these distinct facts, and it certainly has no bearing on the operative issue of New York state law.

interested in doing so no matter the changes to the landscape, years after having title taken away. For example, if the Corporation "abandons" the project after gaining title, clear cutting the land and commencing construction (and after all, the point of vesting title now is to move forward with construction; otherwise why the rush to the courthouse?) there is no certainty that respondent Theresa Schueckler—now widowed—would have the funds to repurchase that property, even if she wanted it in its changed condition.

And that brings me to a point unaddressed by the majority. The Corporation concedes, and FERC anticipates, that the project's details may go through further revision in order to accommodate and address pre-construction problems. It may be that after taking title, and clear-cutting the Scheuckler property, the Corporation modifies its plans, perhaps rendering use of the disputed land unnecessary or requiring an easement to another swath in a different location. Given this uncertainty, and the potential for project redesign that affects the public use justification for taking a designated area of land in the first place, it is nonsensical and unfair to take the Scheuckler property before completing the necessary state permit process and ensuring that the project will likely move ahead in a form approved by New York.

The majority's concern that adherence to the command of the EDPL is unworkable and involves impermissible scrutiny of federal agencies' "public use review and findings" (see majority op at 14) is not borne out by the statute or review of this FERC certificate. No "extensive," costly, and time-consuming state scrutiny is required (id.). All that need be done here is to read the Clean Water Act provision and the condition contained in Appendix B to the FERC certificate, and compare them to the language of the EDPL.

Notwithstanding the majority's disclaimer, it has in fact looked in all the wrong places to determine compliance with the EDPL, focusing on what FERC did but not what it could not and did not do.

A majority of this Court has spoken, and it is now for the legislature to consider whether legislation is necessary to protect owners like the Schuecklers. It would not be the first time the legislature has stepped in after courts have broadly applied the power of eminent domain to divest private owners of their land for a private use with uncertain or unrealized public benefits (see e.g. Kelo v City of New London, Conn., 545 US 469 [2005] [holding that town could seize homes for private redevelopment project to serve "economic development" purpose]; Patrick McGeehan, Pfizer to Leave City That Won Land-Use Case, NY Times, Nov 12, 2009, § A at 1 [discussing aftermath of the Kelo decision, in which the company for which the land was obtained subsequently abandoned the project "as a cost-cutting measure"]; see also Matter of Uptown Holdings, LLC v City of New York, 77 AD3d 434 [1st Dept 2010] [holding that non-blighted area could be seized for economic development purposes notwithstanding lack of protections such as development plan to which developer would be bound]). The United States Supreme Court decision in Kelo v City of New London is perhaps the most infamous; it resulted in a flood of state legislation to prohibit the economic development grounds approved by the Court, as well as decisions by various states' high courts rejecting its rationale on state constitutional grounds (see e.g. Reading Area Water Auth. v Schuylkill River Greenway Assn., 627 Pa 357, 375, 100 A3d 572, 583 [2014] [holding, under Pennsylvania statute passed in the wake of Kelo, that private use with incidental public benefits could not support eminent domain

proceedings]; Norwood v Horney, 110 Ohio St 3d 353, 377, 853 NE2d 1115, 1141 [2006] [adopting Kelo dissenters' analysis]; John M. Broder, States Curbing Right to Seize Private Homes, NY Times, Feb 21, 2006, § A at 1 ["lawmakers in virtually every statehouse across the country are advancing bills and constitutional amendments to limit use of the government's power of eminent domain" in Kelo-type circumstances "in direct response to" the Supreme Court decision]; see also Charles E. Cohen, Eminent Domain after Kelo v. City of New London: An Argument for Banning Economic Development Takings, 29 Harv J L & Pub Policy 491, 532 [2006]; Ilya Somin, Controlling the Grasping Hand: Economic Development Takings After Kelo, 15 Sup Ct Econ Rev 183, 191 [2007] [arguing that an "'economic development' . . . rationale can be used to condemn virtually any property for transfer to a private commercial enterprise"]; Alberto B. Lopez, Kelo-Style Failings, 72 Ohio St L J 777 [2011]).

III.

Judicial Notice

In the alternative, the Corporation argues that even if an incomplete WQC process is grounds for denying vesting of title, that is no barrier to the proceeding here. The Corporation reasons that because FERC has now determined that DEC's denial of the WQC is untimely and thus New York waived its rights under the Clean Water Act, this Court should consider the FERC certificate as satisfying EDPL 206. It further claims that the Appellate Division erred when it failed to take judicial notice of the FERC decision as it should have concluded that "FERC's waiver order removed the obstacle" to exercise of

eminent domain through the EDPL 206 (A) alternative process "on which the majority's decision depended."

The procedural history is more complex and less favorable to the Corporation than its argument suggests. As DEC's denial letter recites, the Corporation initially agreed with DEC "that, for the purposes of review under Section 401 of the CWA, the Joint Application was deemed received by NYSDEC on April 8, 2016, 'thereby extending the date [by which] the NYSDEC has to make a final determination on the application until April 7, 2017.'" DEC issued its decision prior to the agreed extended date. When DEC issued a decision unfavorable to the Corporation, however, the Corporation collaterally attacked the WQC denial by seeking a waiver order from FERC, on the basis that the parties could not agree to extend the date, and so, notwithstanding the parties' agreement, DEC exceeded the permissible time frame for its Clean Water Act review. FERC agreed with the Corporation and denied a stay of its order, and an appeal of that order is now pending before the Second Circuit. Separately, the Second Circuit vacated DEC's order, stating that although it was a "close case," DEC "did not sufficiently articulate the basis for its conclusions," and remanded so that DEC could "more clearly articulate its basis for the denial" (National Fuel Gas Supply Corp. v New York State Dept of Environmental Conservation, 761 Fed Appx 68, 70-72 [2019]). DEC thereafter reissued its denial, elaborating upon its reasoning.

Courts may take judicial notice of facts that amount to common knowledge or may be determined "by resort to easily accessible sources of indisputable accuracy" (Hamilton v Miller, 23 NY3d 592, 603 [2014], quoting People v Jones, 73 NY2d 427, 431 [1989]).

Whether to take judicial notice of such a fact is within the discretion of the trial court (see Hunter v New York, Ontario & W. R.R. Co., 116 NY 615, 621 [1889]; Matter of Crater Club v Adirondack Park Agency, 86 AD2d 714, 715 [3d Dept 1982], affd for reasons stated below 57 NY2d 990 [1982]; Sleasman v Sherwood, 212 AD2d 868, 870 [3d Dept 1995]). Courts decide whether to take judicial notice of a fact "depend[ing] on the nature of the subject, the issue involved, and the apparent justice of the case" (Hunter, 116 NY at 621; see Walker v City of New York, 46 AD3d 278, 282 [1st Dept 2007]). While our state courts are required to take judicial notice of positive law so that they can resolve cases under those laws (see CPLR 4511), here the Corporation argues that the courts should take judicial notice of the *fact* that FERC has deemed DEC to have waived its authority to bar construction. Judicial notice is not mandatory under such circumstances (see Hamilton, 23 NY3d at 603; Sleasman, 212 AD2d at 870).

Notably, the Corporation argues for judicial notice of only part of the events that have transpired in this and parallel litigation. It requests that the courts recognize that FERC has rejected the timeliness of the WQC, but not the existence of pending judicial challenges to FERC's determinations and the possibility that the federal courts may hold that DEC's denial of the WQC is valid. It is not far-fetched that the federal courts may side with New York, given the Corporation's agreement with DEC, as well as the fact that the Corporation could have simply reapplied for the WQC to restart the one-year statutory clock after signing off on the agreement. The Corporation chose not to, instead arguing before FERC and the federal Circuit Courts that DEC's denial was untimely issued and

should be ignored.[8]  Although convenient, this may not be a winning argument, and in any case that uncertainty is a valid basis to decide this appeal on the record as it existed at the time the Corporation filed its vesting petition.  Under the circumstances, the Appellate Division did not abuse its discretion as a matter of law by refusing National Fuel's request to take judicial notice of the FERC decisions.

IV.

Conclusion

Not to be lost in the legal analysis is the practical effect of the majority's ruling. The first page of the FERC certificate establishes the conditional nature of FERC's authorization.  One of the conditions that would stop progress on the pipeline is the failure to establish compliance with "all applicable authorizations required under federal law." Absent proof of receipt of those authorizations, there could be no pipeline, and absent an ability on the part of the condemnor to build the structure that the taking here is intended to accommodate, the courts should not sanction acquisition of the Schueckler property.

It is undisputed that the FERC certificate issued to the Corporation is conditioned on New York State's rights under the Clean Water Act, including the right to deny the Corporation a WQC, preventing construction and derailing the proposed gas pipeline. Given the nature of the project, and the threat of environmental damage from the pipeline's

---

[8] Although respondents' brief discusses the agreement between the Corporation and DEC, it contains no argument in this Court that the Corporation should be collaterally estopped from relying on the FERC decision as a consequence of the agreement.  As such, I limit my discussion to whether the Appellate Division abused its discretion not to take judicial notice in light of the pending federal court challenges to FERC's determination against the DEC.

construction and operation, the WQC process is vitally important. The proposed pipeline would traverse approximately 97 miles in four Western New York counties, including rural communities that would be affected by the project as planned. The path drawn for the pipeline crosses no fewer than 192 State-regulated streams and impacts over 73 acres of federal and State wetlands.[9]

Notwithstanding the vital environmental interests, the majority's reading of the FERC certificate and our procedural law permits the acquisition of private property absent approvals ensuring that those wetlands and waterways—some of which drain into the Great Lakes—would be protected during and after construction of the proposed pipeline. The law does not mandate such a result. Instead, federal and New York laws and regulations guard against environmentally impactive pollutant discharges associated with the pipeline project (see 33 USC § 1341 [a] [1]; EDPL 204 [b] [3]; ECL § 15-0101 et seq.; ECL § 24-0101 et seq.; 6 NYCRR 621.1-621.11).

Nor does the law support the outcome here in which, based on the title of a FERC certificate, the property interest of a lone private individual—respondent Theresa F. Schueckler—is extinguished in furtherance of private economic interests that may never be realized. The courts should not sanction this involuntary transfer of title with its attendant harm to the owner. Theresa F. Shueckler should retain her right to use and

---

[9] The degree to which the proposed project would affect waterways and wetlands is noted in the DEC's explanation for its denial of petitioner's application to obtain a water quality certification for the proposed project.

dispose of her property freely absent an adequate showing justifying divesting her of title.

A showing the corporation has not made as required by the EDPL.

For the foregoing reasons I dissent.

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

Order reversed, with costs, and order of Supreme Court, Allegany County, reinstated. Opinion by Judge Stein.  Chief Judge DiFiore and Judges Wilson and Feinman concur. Judge Rivera dissents and votes to affirm in an opinion, in which Judge Fahey concurs. Judge Garcia took no part.

Decided June 25, 2020